**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

MARGARET J. BAUSCH,

        Plaintiff

   v.

STRYKER CORPORATION,
HOWMEDICA OSTEONICS
CORPORATION DBA STRYKER
ORTHOPAEDICS,  AND
STRYKER IRELAND, LTD.,

        Defendants.

Case No.  08 CV 4248

**Honorable Samuel Der-Yeghiayan**

## HOWMEDICA OSTEONICS CORP.'S MOTION TO DISMISS

Defendant Howmedica Osteonics Corp. (incorrectly named as Howmedica Osteonics Corporation DBA Stryker Orthopaedics), by counsel and pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure, files its Motion to Dismiss.  In support of its motion, as set forth more fully in its Memorandum in Support thereof, defendant states that plaintiff's claims are preempted by federal law.

Respectfully submitted,

HOWMEDICA OSTEONICS CORP.

By: :   */s/ Brian H. Meldrum*
        By Its Attorneys

Brian H. Meldrum (ARDC # 6271672)
STITES & HARBISON, PLLC
400 West Market Street
Suite 1800
Louisville, KY  40202-3352
(502) 587-3400

Dated:  September 2, 2008


CERTIFICATE OF SERVICE

I hereby certify that on September 2, 2008, a copy of the foregoing **Motion to Dismiss,** and **Memorandum in Support of Motion to Dismiss** was filed electronically.

I further certify that I have served these documents by first-class mail, postage prepaid, on the following non CM/ECF participants:

David E. Rapoport
drapoport@rapoportlaw.com
Joshua L. Weisberg
jweisberg@rapoportlaw.com
Rapoport Law Offices, P.C.
20 North Clark Street, Suite 3500
Chicago, IL 60602


*/s/ Brian H. Meldrum*
Brian H. Meldrum

**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS**

MARGARET J. BAUSCH,

          Plaintiff

    v.

STRYKER CORPORATION,
HOWMEDICA OSTEONICS
CORPORATION DBA STRYKER
ORTHOPAEDICS, AND
STRYKER IRELAND, LTD.,

          Defendants.

Case No.  08 CV 4248

**Honorable Samuel Der-Yeghiayan**

**HOWMEDICA OSTEONICS CORP.'S
MEMORANDUM IN SUPPORT OF ITS MOTION TO DISMISS**

Defendant Howmedica Osteonics Corp. (incorrectly named as Howmedica Osteonics

Corporation dba Stryker Orthopaedics) ("HOC") submits this Memorandum of Law in support of

its motion to dismiss Plaintiff's Complaint.

**PRELIMINARY STATEMENT**

This case involves product liability claims arising from the implantation of an artificial

hip prosthesis known as the Trident™ Hip Replacement System ("Trident™"). The Trident™ is

indicated for patients requiring primary total hip arthroplasty or replacement and allows patients

to walk and move in ways that they were not able to before implantation.

Plaintiff alleges that on March 21, 2007, she underwent a right total hip replacement at

Neurologic & Orthopedic Institute of Chicago and that the surgeon implanted the Trident™.

*See* Complaint ¶ 10. Plaintiff claims that the hip implanted during this surgery was "defective as

manufactured, rendering it unreasonably dangerous." *Id.* at ¶ 12, 18. Plaintiff claims that "[a]s a

direct and proximate result of the unreasonably dangerous *Trident* ceramic on ceramic hip

replacement system, the plaintiff has been injured and sustained damages, including but not limited to, an unstable right hip, pain, suffering, disability, loss of a normal life, the need for revision surgery, delayed care for her left hip, and medical and other expenses." *Id.* at 14, 26 (emphasis original). Plaintiff asserts strict liability in tort and negligence claims based on an alleged manufacturing defect against Defendants. *See id.* at ¶¶ 9-26.

The Trident™ is a Class III medical device evaluated under the most rigorous FDA approval process, the Premarket Approval ("PMA") process. The Supreme Court held that, as to Class III devices that are approved by the rigorous PMA process, most common law product liability claims are preempted by the Medical Device Amendments ("MDA") of 1976, 21 U.S.C. § 360K to the Federal Food, Drug and Cosmetics Act ("FDCA"). *See Riegel v. Medtronic*, 128 S.Ct. 999 (2008). Because Plaintiffs' strict liability and negligence claims create requirements for the Trident™ that are separate and distinct from the PMA process, her claims must fail under the standards articulated by *Riegel.*

## ARGUMENT

### I. STANDARD OF REVIEW

Under Federal Rule 12(b)(6), a motion to dismiss should be granted when "it appears beyond doubt that the plaintiff can prove no set of facts in support of his claims which would entitle him to relief." *Abdoh v. City of Chicago*, 930 F. Supp. 311, 312 (N.D. Ill. 1996) (quotations omitted). A court should accept the plaintiff's factual allegations as true, but if "the complaint fails to state a claim upon which relief can be granted, the court must dismiss the complaint." *Horton v. Marovich*, 925 F. Supp. 532, 535 (N.D. Ill. 1996) (citing Fed. R. Civ. P. 12(b)(6); *Gomez v. Illinois State Board of Educ.*, 811 F.2d 1030, 1039 (7th Cir. 1987)). Plaintiff's claims against Defendants should be dismissed because she has failed to state a claim upon which relief can be granted.

## II.    PLAINTIFF'S CLAIMS AGAINST HOC ARE EXPRESSLY PREEMPTED BY THE MDA.

On February 20, 2008, the Supreme Court held that Class III medical devices approved pursuant to the exacting and comprehensive PMA process are exempt from all common law claims imposing requirements that are different from, or in addition to, the FDA requirements. *See Riegel*, 128 S.Ct. at 1007, 1011.  The Court held that the MDA's preemption clause "bars common-law claims challenging the safety and effectiveness of a medical device given premarket approval by the [FDA]." *Id.* at 1002.

Since *Riegel*, lower courts have recognized the clear holding and have dismissed causes of action.  *See, e.g., Colacicco v. Apotex, Inc.,* 521 F.3d 253, 261-2 (3d Cir. 2008) ("An express preemption situation is exemplified by [*Riegel*], where . . . [the Supreme Court] held that in light of [the express preemption provision of the MDA], plaintiffs' claims that a [device] was designed, labeled, and manufactured in a way that violated New York common law were preempted."); *Adkins v. Cytyc Corp.,* 2008 WL 2680474 (W.D.Va. July 3, 2008) (dismissing claims "that sound in negligence or breach of a duty related to the design, manufacturing, and labeling of the [] device" on account of Riegel); *O'Neal v. SmithKline Beecham Corp.,* No. CIV S-06-1063 (FCD/DAD) 2008 WL 1721891, at *6 (E.D.Cal. Apr. 10, 2008) (denying reconsideration of a decision finding preemption and stating *Riegel* found "that federal law preempted breach of implied warranty; negligence in the design, testing, inspection, distribution, labeling, . . . manufacturing not premised on the theory that defendant violated federal law"); *Despain v. Bradburn,* 2008 Ark. LEXIS 233 (Ark. April 10, 2008) (reversing decision "in light of the Supreme Court's conclusion in *Riegel* [] that the state-law tort claims are, in fact, pre-empted by the MDA"); *Troutman v. Curtis,* 185 P.3d 930 (Kan. June 20, 2008) (granting

summary judgment on claims of negligent design, testing, inspection, manufacturing, sale,

warning, and strict liability based on *Riegel*); *BIC Pen Corp. v. Carter,* 251 S.W.3d 500 (Tex.

Apr. 18, 2008) (holding design defect claim preempted based on *Riegel); McGuan v.

Endovascular Technologies, Inc.,* 2008 WL 3139418 (Cal. Sup. May 19, 2008) (dismissing

product liability claims against the Ancure Endograft System as preempted by the MDA) .

*Johnson v. Endovascular Technologies, Inc.,* 2008 WL 3139424 (Cal. Sup. May 19, 2008)

(finding product liability claims against the Ancure Endograft System are preempted by the

MDA).

In *Riegel*, the Supreme Court provided a two-step analysis for courts to use to decide

whether the MDA preempts plaintiff's claims.  First, courts must determine "whether the Federal

Government has established requirements applicable to [the subject device]."  *Riegel*, 128 S. Ct.

at 1006.  And, second, courts analyze "whether the . . . common-law claims rely upon "any

requirement" of [state] law applicable to the [medical device] that is 'different from, or in

addition to' the federal requirements and that 'relates to the safety or effectiveness of the device

or to any other matter included in a requirement applicable to the device.'"  *Id.*  Both steps of the

*Riegel* analysis apply in this case.

### A.    The PMA process sets forth the federal requirements applicable to the Trident™.

*Riegel* determined that the MDA and particularly, the rigorous requirements imposed on

device manufacturers during the PMA process, expressly preempts state tort-law claims,

including negligence and strict liability claims.  *Id.* at 1007-1009, 1011.  The Court recognized

that the PMA process is "specific to individual devices" and constitutes a "federal safety review"

of each product application submitted.  *Id.* at 1006-1007

As noted above, the Trident™ is a Class III medical device under the FDCA subject to

the PMA process.[1]  *See* Trident's™ PMA Supplemental Record, attached as Exhibit A;

Trident™'s approval letter posted on the FDA's website, attached as Exhibit B.  HOC submitted

a PMA application to the FDA after the device received an Investigation Device Exemption

("IDE"), which "permit[s] investigational device[s] to be used in a clinical study in order to

collect safety and effectiveness data required to support a . . . PMA."[2]  During the PMA process,

HOC provided the FDA with information and data regarding the safety and effectiveness of the

Trident™.  After reviewing HOC's documentation, the FDA approved the Trident™ for

commercial use.  *See* Exhibit B.  This approval, like other FDA approvals of Class III devices,

was contingent on HOC satisfying the strict MDA standards contained in the PMA

documentation and complying with the mandatory reporting requirements.  *Id.*

Because Plaintiff's claims are based on a PMA-approved Class III medical device, they

are controlled by the *Riegel* preemption analysis.  And, because the PMA process is "specific to

individual devices" and the Trident™ constitutes a Class III medical device subject to those

requirements, the first step of the two-step preemption analysis is satisfied.

---

[1] *See* http://www.accessdata.fda.gov/scripts/cdrh/cfdocs/cfPMA/PMASimpleSearch.cfm?db=PMA&id=8810
(Trident's™ Supplemental PMA Record) attached as Exh. A and http://www.fda.gov/cdrh/pdf/p000013a.pdf.
(Trident™'s approval letter posted on the FDA's website), attached as Exh. B.  HOC asks that the Court take
judicial notice of these publicly available documents showing the Trident™'s premarket approval by the
FDA.  *See GE Capital Corp. v. Lease Resolution Corp.,* 128 F.3d 1074, 1080 - 81 (7th Cir., 1997) (A
district court may take judicial notice of "matters of public record without converting a motion for failure
to state a claim into a motion for summary judgment"); *see also Horne v. Novartis Pharms. Corp.*, 541 F.
Supp. 2d 768, 777 (W.D. N.C. 2008) (public records appropriate for judicial notice in a 12(b)(6) motion
to dismiss context include FDA documents).  Said documents are self-authenticated under F.R.E. 902.

[2] *See* http://www.fda.gov/cdrh/devadvice/ide/index.shtml (last accessed September 2, 2008).

**B.    Plaintiff's common-law claims are preempted because they rely upon state "requirements" that are "different from, or in addition to" the PMA process's requirements.**

Counts I and II of Plaintiff's Complaint, labeled Strict Liability in Tort and Negligence, are based on an alleged manufacturing defect. Complaint, ¶¶9-26. *Riegel* considered analogous allegations brought by plaintiffs and held they were preempted by the MDA. *See Riegel*, 128 S. Ct. 999 (holding that state tort claims are expressly preempted by the PMA process). Similarly, Plaintiff's allegations are preempted by the PMA process, the requirements of which Defendants have satisfied. Plaintiff's claims are preempted because a finding in Plaintiff's favor on any of these claims imposes a state requirement that is "different from, or in addition to" the requirements imposed by the FDA.

As the Supreme Court explained, the MDA places a burden on product manufacturers to provide the FDA with significant volumes of information relating to its proposed product's design, labeling, performance, and intended use. *Riegel*, 128 S. Ct. at 1004 (citing § 360c(a)(1)(C)(ii)). The FDA thoroughly reviewed all of the information submitted by HOC and once the FDA was satisfied that the product was reasonably safe and effective, it approved the product's design, labeling, and manufacture for general use. *See id.* at 1003-1005. This approval preempts state common or statutory law claims alleging that an approved product is defective.

In *Riegel*, the Supreme Court analyzed a case involving a balloon catheter, a Class III medical device manufactured by Medtronic, Inc. and approved for general use pursuant to the PMA process. In that case, plaintiffs brought, among other causes of action, strict liability and negligence claims premised on alleged manufacturing defect against Medtronic after the catheter ruptured. *Riegel*, 128 S. Ct. at 1005-1006. The Court held that the PMA process expressly preempted these negligence and strict liability claims because those causes of action "impose '*requirement[s]*' and would be pre-empted by federal requirements specific to a medical device."

*Id.* at 1007 (citing *Medtronic, Inc. v. Lohr*, 518 U.S. 470, 512 (1996)) (emphasis added).  The Court explained that state tort judgments, which are premised on establishing a legal duty, "require[] a manufacturer's [devices] to be safer . . . than the model the FDA has approved [and] disrupts the federal scheme . . . ." *Id.* at 1008.  In other words, if a jury determines that a manufacturer of a Class III medical device approved through the PMA process is liable under a negligence or strict liability theory, the jury would, in effect, conclude that the FDA "got it wrong" when it determined the device was safe and effective.  *See id.*

Like the plaintiffs in *Riegel*, Plaintiff's strict liability and negligence claims based on an alleged manufacturing defect must fail.  First, HOC submitted significant volumes of data, information, and other details required by the PMA process to the FDA regarding the Trident's™ design, label, and manufacturing process.  And the FDA approved the Trident's™ design, applicable packaging, package inserts, and manufacturing processes.  This approval set the Trident's™ design, manufacture, and warning standards.  *See* Exh. B.  HOC has not deviated from the FDA-approved standards at any time and has had every change its has made approved by the FDA.  *See* Exh. A.

Additionally, Plaintiff's strict liability and negligence claims based on defective manufacture fail to allege that HOC deviated from the FDA-approved manufacturing processes.  *See* Complaint, ¶¶ 9-26.  As noted above, the FDA specifically  approved the Trident's™ manufacturing processes.  Because Plaintiff failed to sufficiently allege the defective manufacturing claim or indicate that HOC failed to comply with the FDA's requirements, any claim asserted based on a defective manufacturing claim must fail.

The FDA imposed the same requirements regarding safety and effectiveness with regard to the Trident™ Ceramic System as it did on the *Riegel* device – both are Class III devices that

were subjected to the PMA process.  Just as in *Riegel*, Plaintiff's state law claims impose

different or additional requirements on the device, which are expressly prohibited by the MDA.

*See Riegel*, 128 S. Ct. at 1007.  Accordingly, these counts are preempted and must be dismissed.

> **C.    The Rationale Developed By the Supreme Court In *Riegel* Is Sensible and Is Supported By the "Rigorous" Scrutiny Applied To Class III Devices Through the FDA's PMA Process.**

The Supreme Court's decision to preempt state law claims that impose "requirements"

that are "different from, or in addition to" the FDA's approval in the PMA process is reasonable

because Class III medical devices like the Trident™ undergo stringent analysis before they are

released for commercial sale and use.  In fact, under the MDA,[3] Class III devices "receiv[e] the

most federal oversight" because they "present[] a potential unreasonable risk of illness or injury"

or are "for a use in supporting or sustaining human life or for a use which is of substantial

importance in preventing impairment of human health."  *Riegel*, 128 S.Ct. at 1003 (quoting 21

U.S.C. § 360c(a)(1)(C)(ii)).  The rigorous premarket approval process is required of only a <u>very</u>

small subset of Class III devices.  *See Riegel*, 128 S.Ct. at 1004; *Riegel v. Medtronic*, 451 F.3d

104, 111-12 (2d Cir. 2006) (noting that in 2005 only 1% of Class III medical devices were

subject to the PMA process).  The remaining Class III medical devices are approved through a

less rigorous process known as a § 510(k) premarket notification process.  *Riegel*, 128 S.Ct. at

1004 (In 2005, the FDA approved 3148 through the 510(k) process and only 32 devices through

the PMA process).

Prior to approval, the small subset of Class III devices subject to PMA, like the Trident™

go through an extensive evaluation process, which requires the manufacturer to submit

---

[3] In 1976, Congress enacted the Medical Device Amendments ("MDA") to the Federal Food, Drug and Cosmetic Act ("FDCA"), which expanded the FDA's authority to regulate medical devices.  21 U.S.C. § 360c et seq; *see also Riegel*, 128 S. Ct. at 1002-1003 (noting the MDA "swept back some state obligations and imposed a regime of detailed federal oversight").

substantial information and the "FDA spends an average of 1,200 hours reviewing each application." *Riegel*, 128 S.Ct. at 1004.

Congress devised the PMA process to ensure that manufacturers minimize patient risk yet continue to innovate and develop new devices. Congress charged FDA with ensuring safety and efficacy, but also enacted an express preemption provision[4] to prevent states from imposing additional or different medical device requirements, directly, or through product liability litigation. 21 U.S.C. § 361k(A); *see generally Riegel*, 128 S.Ct. at 1003-1005; *Riegel*, 451 F.3d at 109-112; H.R. Rep. No. 94-853, at 12, 45 (1976) (noting the "general prohibition on non-federal regulation" in the statute).

Pursuant to the MDA, the FDA has promulgated regulations delineating PMA requirements for Class III medical devices. *See Buckman Co. v. Plaintiff's Legal Comm.*, 531 U.S. 341, 343 (2001). Specifically, a PMA application must include comprehensive data from which the FDA can reasonably determine the device's safety and efficacy, including, without limitation, human clinical trials, design specifications, manufacturing processes and quality controls, and proposed labeling and advertising. *See* 21 C.F.R. § 814.20.

The FDA "grants premarket approval only if it finds there is a 'reasonable assurance' of the device's safety and effectiveness." *Riegel*, 128 S.Ct. at 1004; *Riegel*, 451 F.3d at 109 (quoting 21 U.S.C. § 360e(d)). The PMA process "includes review of the device's proposed labeling" and "must determine that the proposed labeling is neither false nor misleading." *Riegel*, 128 S.Ct. at 1004 (*citing* 21 U.S.C. §§ 360c(a)(2)(B), 360e(d)(1)(A)).

---

[4] The express preemption provision provides:
  [N]o State or political subdivision of a State may establish or continue in effect with respect to a device intended for human use any requirement -
  (1) which is different from, or in addition to, any requirement applicable under this chapter to the device, and
  (2) which relates to the safety or effectiveness of the device or to any other matter included in a requirement applicable to the device under this chapter. 21 U.S.C. § 360k (a).

If a device receives PMA approval, the approval includes detailed specifications and requires the manufacturer to obtain FDA approval for any changes in "design specifications, manufacturing processes, labeling, or any other attribute, that would affect safety or effectiveness." *Riegel*, 128 S.Ct. at 1005 (citing 21 U.S.C. § 360e(d)(6)(A)(i)). For such changes, the manufacturer must submit and receive supplemental PMA approval, which evaluates the proposed changes "under largely the same criteria as an initial application." *Riegel*, 128 S.Ct. at 1005 (citing 21 U.S.C. § 360e(d)(6)). After the PMA, the FDA continues to maintain control over approved device's safety and effectiveness. The devices are subject to reporting requirements, including informing the FDA of studies, investigations, or incidents where the device caused or could have caused serious injury. *See Riegel*, 128 S.Ct. at 1005. The FDA retains the authority to withdraw PMA based on such new information. *Id.*

Before HOC marketed the Trident™, the device underwent the exacting and comprehensive PMA process and, after that process, received FDA approval. *See* Exh. B. Each modification of the Trident™ has undergone the supplemental PMA process. *See* Exh. A. Plaintiff's claims are thus preempted.

## CONCLUSION

According to *Riegel v. Medtronic*, 128 S.Ct. 999, plaintiff's claims against HOC are preempted by the Premarket Approval Process established by the FDA pursuant to the Medical Device Amendments. Consequently, because plaintiff's amended complaint fails to state a claim upon which relief may be granted, this Court should dismiss the amended complaint with prejudice.

Respectfully submitted,

HOWMEDICA OSTEONICS CORP.,


By:  :   */s/ Brian H. Meldrum*
　　　　　By Its Attorneys

Brian H. Meldrum (ARDC # 6271672)
STITES & HARBISON, PLLC
400 West Market Street
Suite 1800
Louisville, KY  40202-3352
(502) 587-3400

Dated:  September 2, 2008

# EXHIBIT A



**U.S. Food and Drug Administration**

Department of Health and Human Services

CENTER FOR DEVICES AND RADIOLOGICAL HEALTH

FDA Home Page | CDRH Home Page | Search | A-Z Index

(Questions?)

510(k) | Registration & Listing | Adverse Events | PMA | Classification | CLIA
CFR Title 21 | Advisory Committees | Assembler | Recalls | Guidance | Standards

New Search                                      Back To Search Results

Note: this medical device record is a supplement. The device description may
have changed. Be sure to look at the original PMA to get an up-to-date view of
this device.

## Premarket Approval (PMA) Database

| | |
|---|---|
| **Trade Name** | OSTEONICS ABC/TRIDENT SYSTEMS |
| **Classification Name** | Prosthesis, Hip, Semi-Constrained, Metal/Ceramic/Ceramic/Metal, Cemented Or Uncemented |
| **Applicant** | HOWMEDICA OSTEONICS CORP. |
| **PMA Number** | P000013 |
| **Supplement Number** | S001 |
| **Date Received** | 02/04/2003 |
| **Decision Date** | 03/17/2003 |
| **Product Code** | MRA    [ Search Manufacturers for MRA ] |
| **Advisory Committee** | Orthopedic |
| **Supplement Type** | Real-Time Process |
| **Supplement Reason** | Design Change - Minor |
| **Expedited Review Granted?** | No |

**Approval Order Statement** Approval for the following items: 1)
use of the trident acetabular system with v40 alumina heads and
additional c-taper alumina head sizes (and associated stems) 2)
use of the trident acetabular system with v40/c-taper and morse
taper adapter sleeves (and associated femoral stems) 3) use of
additional styles of trident acetabular shells; and 4) associated
labeling changes due to modifications identified above.

Database Updated 04/08/2008

CDRH Home Page | CDRH A-Z Index | Contact CDRH | Accessibility | Disclaimer
FDA Home Page | Search FDA Site | FDA A-Z Index | Contact FDA | HHS Home Page

Center for Devices and Radiological Health / CDRH



**EXHIBIT**

A

# EXHIBIT B



**DEPARTMENT OF HEALTH & HUMAN SERVICES**                    Public Health Service

FEB 3 2003                    Food and Drug Administration
                              9200 Corporate Boulevard
                              Rockville MD 20850

Mr. William J. Cymbaluk
Vice President, Regulatory Affairs, Quality Assurance and Clinical Research
Howmedica Osteonics Corporation
359 Veterans Boulevard
Rutherford, New Jersey 07070-2584

Re:  P000013
     Osteonics® ABC System and Trident™ System
     Filed: March 2, 2000
     Amended: March 10, April 19, May 5, June 2, June 6, June 8, August 21,
              September 18, and September 21, 2000; March 30, June 5, 2001;
              March 15, November 12, and November 22, 2002
     Procode: MRA

Dear Mr. Cymbaluk:

The Center for Devices and Radiological Health (CDRH) of the Food and Drug
Administration (FDA) has completed its review of your premarket approval application
(PMA) for the Osteonics® ABC System and Trident™ System. These devices are
indicated for patients requiring primary total hip arthroplasty due to painful disabling
joint disease of the hip resulting from non-inflammatory degenerative arthritis
(osteoarthritis, avascular necrosis, traumatic arthritis, slipped capital epiphysis, pelvic
fracture, femoral fracture, failed fracture fixation, or diastrophic variant). We are
pleased to inform you that the PMA is approved. You may begin commercial
distribution of the device in accordance with the conditions described below and in the
"Conditions of Approval" (enclosed).

The sale, distribution, and use of this device are restricted to prescription use in
accordance with 21 CFR 801.109 within the meaning of section 520(e) of the Federal
Food, Drug, and Cosmetic Act (the act) under the authority of section 515(d)(1)(B)(ii)
of the act. FDA has also determined that, to ensure the safe and effective use of the
device, the device is further restricted within the meaning of section 520(e) under the
authority of section 515(d)(1)(B)(ii) insofar as the sale, distribution, and use must not
violate sections 502(q) and (r) of the act.

In addition to the postapproval requirements outlined in the enclosure, you have agreed
to provide long-term (i.e., 5 year) data in a postapproval report. The results of this long-
term data must be reflected in the product labeling (via supplement) when the post-
approval study is completed.

**EXHIBIT**

tabbies

B

Page 2 - Mr. William J. Cymbaluk

CDRH does not evaluate information related to contract liability warranties, however you should be aware that any such warranty statements must be truthful, accurate, and not misleading, and must be consistent with applicable Federal and State laws.

CDRH will notify the public of its decision to approve your PMA by making available a summary of the safety and effectiveness data upon which the approval is based. The information can be found on the FDA CDRH Internet HomePage located at http://www.fda.gov/cdrh/pmapage.html. Written requests for this information can also be made to the Dockets Management Branch, (HFA-305), Food and Drug Administration, 5630 Fishers Lane, Rm. 1061, Rockville, MD 20852. The written request should include the PMA number or docket number. Within 30 days from the date that this information is placed on the Internet, any interested person may seek review of this decision by requesting an opportunity for administrative review, either through a hearing or review by an independent advisory committee, under section 515(g) of the Federal Food, Drug, and Cosmetic Act (the act).

Failure to comply with the conditions of approval invalidates this approval order. Commercial distribution of a device that is not in compliance with these conditions is a violation of the act.

You are reminded that, as soon as possible and before commercial distribution of your device, you must submit an amendment to this PMA submission with copies of all approved labeling in final printed form. The labeling will not routinely be reviewed by FDA staff when PMA applicants include with their submission of the final printed labeling a cover letter stating that the final printed labeling is identical to the labeling approved in draft form. If the final printed labeling is not identical, any changes from the final draft labeling should be highlighted and explained in the amendment.

All required documents should be submitted in triplicate, unless otherwise specified, to the address below and should reference the above PMA number to facilitate processing.

> PMA Document Mail Center (HFZ-401)
> Center for Devices and Radiological Health
> Food and Drug Administration
> 9200 Corporate Boulevard
> Rockville, Maryland 20850

Page 3 - Mr. William J. Cymbaluk

If you have any questions concerning this approval order, please contact Mr. Peter Allen at (301) 594-2036.

Sincerely yours,

Celia M. Witten, Ph.D., M.D.
Director
Division of General, Restorative
  and Neurological Devices
Office of Device Evaluation
Center for Devices and
  Radiological Health

Enclosure

Last Modified: 1-31-02

## CONDITIONS OF APPROVAL

PREMARKET APPROVAL APPLICATION (PMA) SUPPLEMENT. Before making any change affecting the safety or effectiveness of the device, submit a PMA supplement for review and approval by FDA unless the change is of a type for which a "Special PMA Supplement-Changes Being Effected" is permitted under 21 CFR 814.39(d) or an alternate submission is permitted in accordance with 21 CFR 814.39(e) or (f). A PMA supplement or alternate submission shall comply with applicable requirements under 21 CFR 814.39 of the final rule for Premarket Approval of Medical Devices.

All situations that require a PMA supplement cannot be briefly summarized; therefore, please consult the PMA regulation for further guidance. The guidance provided below is only for several key instances.

A PMA supplement must be submitted when unanticipated adverse effects, increases in the incidence of anticipated adverse effects, or device failures necessitate a labeling, manufacturing, or device modification.

A PMA supplement must be submitted if the device is to be modified and the modified device should be subjected to animal or laboratory or clinical testing designed to determine if the modified device remains safe and effective.

A "Special PMA Supplement - Changes Being Effected" is limited to the labeling, quality control and manufacturing process changes specified under 21 CFR 814.39(d)(2). It allows for the addition of, but not the replacement of previously approved, quality control specifications and test methods. These changes may be implemented before FDA approval upon acknowledgment by FDA that the submission is being processed as a "Special PMA Supplement - Changes Being Effected." This procedure is not applicable to changes in device design, composition, specifications, circuitry, software or energy source.

Alternate submissions permitted under 21 CFR 814.39(e) apply to changes that otherwise require approval of a PMA supplement before implementation of the change and include the use of a 30-day PMA supplement or annual postapproval report (see below). FDA must have previously indicated in an advisory opinion to the affected industry or in correspondence with the applicant that the alternate submission is permitted for the change. Before such can occur, FDA and the PMA applicant(s) involved must agree upon any needed testing protocol, test results, reporting format, information to be reported, and the alternate submission to be used.

Alternate submissions permitted under 21 CFR 814.39(f) for manufacturing process changes include the use of a 30-day Notice. The manufacturer may distribute the device 30 days after the date on which the FDA receives the 30-day Notice, unless the FDA notifies the applicant within 30 days from receipt of the notice that the notice is not adequate.

**POSTAPPROVAL REPORTS.** Continued approval of this PMA is contingent upon the submission of postapproval reports required under 21 CFR 814.84 at intervals of 1 year from the date of approval of the original PMA. Postapproval reports for supplements approved under the original PMA, if applicable, are to be included in the next and subsequent annual reports for the original PMA unless specified otherwise in the approval order for the PMA supplement. <u>Two copies</u> identified as "Annual Report" and bearing the applicable PMA reference number are to be submitted to the PMA Document Mail Center (HFZ-401), Center for Devices and Radiological Health, Food and Drug Administration, 9200 Corporate Blvd., Rockville, Maryland 20850. The postapproval report shall indicate the beginning and ending date of the period covered by the report and shall include the following information required by 21 CFR 814.84:

1.  Identification of changes described in 21 CFR 814.39(a) and changes required to be reported to FDA under 21 CFR 814.39(b).

2.  Bibliography and summary of the following information not previously submitted as part of the PMA and that is known to or reasonably should be known to the applicant:

    a.  unpublished reports of data from any clinical investigations or nonclinical laboratory studies involving the device or related devices ("related" devices include devices which are the same or substantially similar to the applicant's device); and

    b.  reports in the scientific literature concerning the device.

If, after reviewing the bibliography and summary, FDA concludes that agency review of one or more of the above reports is required, the applicant shall submit two copies of each identified report when so notified by FDA.

**ADVERSE REACTION AND DEVICE DEFECT REPORTING.** As provided by 21 CFR 814.82(a)(9), FDA has determined that in order to provide continued reasonable assurance of the safety and effectiveness of the device, the applicant shall submit 3 copies of a written report identified, as applicable, as an "Adverse Reaction Report" or "Device Defect Report" to the PMA Document Mail Center (HFZ-401), Center for Devices and Radiological Health, Food and Drug Administration, 9200 Corporate Blvd., Rockville, Maryland 20850 within 10 days after the applicant receives or has knowledge of information concerning:

1.  A mix-up of the device or its labeling with another article.

2.  Any adverse reaction, side effect, injury, toxicity, or sensitivity reaction that is attributable to the device and:

    a.  has not been addressed by the device's labeling; or

    b.  has been addressed by the device's labeling but is occurring with unexpected severity or frequency.

3. Any significant chemical, physical or other change or deterioration in the device, or any failure of the device to meet the specifications established in the approved PMA that <u>could not</u> cause or contribute to death or serious injury but <u>are not</u> correctable by adjustments or other maintenance procedures described in the approved labeling. The report shall include a discussion of the applicant's assessment of the change, deterioration or failure and any proposed or implemented corrective action by the applicant. When such events are correctable by adjustments or other maintenance procedures described in the approved labeling, all such events known to the applicant shall be included in the Annual Report described under "Postapproval Reports" above unless specified otherwise in the conditions of approval to this PMA. This postapproval report shall appropriately categorize these events and include the number of reported and otherwise known instances of each category during the reporting period. Additional information regarding the events discussed above shall be submitted by the applicant when determined by FDA to be necessary to provide continued reasonable assurance of the safety and effectiveness of the device for its intended use.

## REPORTING UNDER THE MEDICAL DEVICE REPORTING (MDR) REGULATION.

The Medical Device Reporting (MDR) Regulation became effective on December 13, 1984. This regulation was replaced by the reporting requirements of the Safe Medical Devices Act of 1990 which became effective July 31, 1996 and requires that all manufacturers and importers of medical devices, including in vitro diagnostic devices, report to the FDA whenever they receive or otherwise become aware of information, from any source, that reasonably suggests that a device marketed by the manufacturer or importer:

1. May have caused or contributed to a death or serious injury; or

2. Has malfunctioned and such device or similar device marketed by the manufacturer or importer would be likely to cause or contribute to a death or serious injury if the malfunction were to recur.

The same events subject to reporting under the MDR Regulation may also be subject to the above "Adverse Reaction and Device Defect Reporting" requirements in the "Conditions of Approval" for this PMA. FDA has determined that such duplicative reporting is unnecessary. Whenever an event involving a device is subject to reporting under both the MDR Regulation and the "Conditions of Approval" for a PMA, the manufacturer shall submit the <u>appropriate reports required by the MDR Regulation</u> within the time frames as identified in 21 CFR 803.10(c) using FDA Form 3500A, i.e., 30 days after becoming aware of a reportable death, serious injury, or malfunction as described in 21 CFR 803.50 and 21 CFR 803.52 and 5 days after becoming aware that a reportable MDR event requires remedial action to prevent an unreasonable risk of substantial harm to the public health. The manufacturer is responsible for submitting a baseline report on FDA Form 3417 for a device when the device model is first reported under 21 CFR 803.50. This baseline report is to include the PMA reference number. Any written report and its envelope is to be specifically identified, e.g., "Manufacturer Report," "5-Day Report," "Baseline Report," etc.

page 3

Any written report is to be submitted to:

> Food and Drug Administration
> Center for Devices and Radiological Health
> Medical Device Reporting
> PO Box 3002
> Rockville, Maryland 20847-3002

Copies of the MDR Regulation (FOD # 336&1336)and FDA publications entitled "An Overview of the Medical Device Reporting Regulation" (FOD # 509) and "Medical Device Reporting for Manufacturers" (FOD #987) are available on the CDRH WWW Home Page. They are also available through CDRH's Fact-On-Demand (F-O-D) at 800-899-0381. Written requests for information can be made by sending a facsimile to CDRH's Division of Small Manufacturers International and Consumer Assistance (DSMICA) at 301-443-8818.